UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 16 CR 717 |
| vs. | ) | |
| | ) | Judge Charles P. Kocoras |
| TIMOTHY G. FISHER | ) | |

## GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS

The UNITED STATES OF AMERICA, through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby respectfully moves this Court to impose a sentence of 10 years imprisonment, and order restitution in the amount of $27,651,838. In support of its recommendation, the government states as follows:

**I.    Presentence Report**

The government has no objections or corrections to the PSR other than as to the enhancement regarding substantial financial harm. The PSR applied a four-level increase to the offense level calculation to account for substantial harm to five or more victims. (PSR at line 33). This is consistent with the plea agreement entered into by the parties, however, the government now agrees that despite the staggering size of the losses, a more appropriate measure of the financial harm is the two-level enhancement provided Guideline §2B1.1(b)(2)(A). Consequently, defendant's guideline calculation should be reduced by two-levels.

1

## II.  Introduction

Defendant aided and assisted in the commission of a $179 million investment fraud scheme.   This fraud resulted in the demise of a registered investment advisor, and a long-standing community bank.   He also caused significant financial stress to other financial institutions, fiduciaries, entities, and untold individuals, who sought the safety of government guaranteed investments.

In 2011, Fisher was living in California and working as a business development officer for a Wells Fargo Bank branch in Pasadena, and Nikesh Patel was living in Florida attempting to start various non-banking ventures.   Fisher met Patel in approximately 2008 when they were employed by Beach Bank in Manhattan Beach, California.   Beginning in approximately 2010 or 2011, they engaged in several business ventures including an herbal supplement/male enhancement pill business and a financial business that became known as First Farmers Financial ("FF").

Between 2011 and 2014, Patel and Fisher, through FF engaged in a series of financial frauds that culminated in the charged conduct.   Essentially, they obtained loans and misapplied the proceeds to acquire assets, make investments, pay prior debts, and enrich themselves.   Neither Fisher nor Patel contributed any capital or funding for any of the assets they obtained from this venture.

Fisher was handsomely rewarded for his participation in the scheme.   In addition to acquiring assets, Fisher dramatically improved his lifestyle and increased

2

his yearly income nearly six-fold, from approximately $75,000 per year at Wells Fargo to approximately $500,000 per year at FF. (PSR at ¶ 87-88).

Fisher's main role in the FF frauds was in his preparation of multiple false financial statements, maintaining nearly daily contact with Patel, and enjoying the benefits of a portion of the converted money. Fisher had no direct contact with Pennant but created the false financials FF needed to become a USDA lender, as well as to obtain and maintain Pennant's loan business.

*USDA Certification / Lies to USDA*

Between late 2011 and April 2012, Patel and Fisher applied to the USDA to become a non-traditional, i.e., non-bank lender of USDA guaranteed loans. In so doing, they fabricated information regarding their financial stability and experience. In November 2011, Patel hired a CPA in Florida ("K.C.") from a Craigslist ad to complete the audited financial statements FF needed for USDA approval. In preparing the statements, K.C. relied upon two letters that Fisher created using Wells Fargo letterhead. One falsely asserted that FF had liquid assets in excess of $22 million on deposit in a money market account, and the second falsely asserted that FF had in excess of $100,000 on deposit in a checking account. FF actually had no such assets either at Wells Fargo or elsewhere. Fisher created both letters, identified another bank officer as the author, and sent both letters to K.C. When K.C. sought to confirm the representations, Fisher and Patel arranged for K.C. to telephone the bank at a designated time and number. Fisher arranged for an

3

individual at the bank to falsely confirm the fabricated financial information. K.C. relied upon these false verifications to complete the "audited" financial statement that FF submitted to the USDA. On April 2, 2012, the USDA approved FF's participation in the lending program.

Under the USDA lending program, FF acted as a loan originator, finding qualified borrowers, making or arranging loans on their behalf, and obtaining USDA guarantees for a portion of the loans. As the loan originator, FF was able to sell the USDA guaranteed portion to others, but remained responsible as the "servicer," that is, the party responsible for collecting the interest and principal payments from the borrower and remitting those payments to the investors who bought an interest in the loans. For these reasons, the independent financial stability and liquidity of the loan servicer was material.

*Banes Capital Management*

FF sold USDA guaranteed loans to Banes Capital Management in Tennessee. Between October 2012 and August 2013, FF sold the guaranteed portion of three loans that were actually guaranteed by the USDA. Fisher did not have direct contact with Banes regarding the sale of these or any other FF loans; however, he was responsible for assisting in aspects of servicing these genuine loans. Despite his involvement in servicing these loans, Fisher made no effort to ensure that FF did not convert a portion of these "legitimate" loan proceeds to engage in unrelated lending and to pay FF's expenses. Patel and FF sold three fictitious USDA loans to Banes

at the same time that they sold Banes "genuine" USDA loans. Patel states that Fisher was aware of the fictitious loans to Banes, however, there is no independent evidence to corroborate those claims, and Fisher denies them.[1]

*Pennant Loan Fraud*

In approximately March 2013, Pennant Management, an investment advisor in Milwaukee, sought to obtain USDA guaranteed loans to hold in an investment-type pool for their clients. To induce Pennant and its clients to invest in (fictitious) USDA guaranteed loans, Patel falsely represented that FF had $37 million in assets, $17 million in cash on hand, and total profits of $51 million. Fisher created the false financial statements and balance sheets provided to Pennant for calendar years 2011, 2012, and the first two months of 2013.[2] In text messages between Fisher and Patel on April 3, 2013, without identifying any particular lender or user of the information, Fisher and Patel discussed preparing a balance sheet and loan

---

1   Still, it should be noted that the first fictitious USDA – Banes loan, was an $8.9 million loan to Medical Investment Holdings III, an entity Fisher and Patel owned. A portion of the proceeds of this loan repaid bridge loans they previously obtained for MIH with other lenders.

2   On March 14, 2013, Pennant requested FF to provide financial statements for 2011, 2012, and the first two months of 2013. That same day, e-mails between Patel and Fisher discuss whether they should show more cash on their balance sheet if "*they*" ask "how we finance unguaranteed portions." (The emails do not specifically identify the victim by name) At 9 a.m Fisher sent Patel a balance sheet showing $3 million in cash and $37 million in total assets. In e-mails, Fisher suggests telling "*them*" "we are financing the unguaranteed portions with additional member injections and net profits." (At this point neither Fisher nor Patel had any capital to inject in FF.) Patel sent a subsequent email asking Fisher to "increase the cash to about $14 million to show additional capital they injected." Fisher complied and e-mailed Patel a revised balance sheet showing cash on hand as of 2-28-13 to be $17 million with total profits to be $51 million. FF had no such cash or profits. Patel sent the revised balance sheet to Pennant prior to Pennant's agreement to purchase loans from FF.

projection numbers:

> F: "If we have a line for 50 million, and we are showing 60 million in annual loans, how are we showing so much volume and what are we supposed to do with the differences"

> P: "They will increase our line. That is the plan."

> F: "Cool, I will work out the numbers."

> F: "Alright brother, sent the info out. Talk to you later in the am." (Attachment A)

In December 2013, FF sought to expand their line of credit and sell more guaranteed loans to Pennant; however, Pennant required audited financial statements for 2012, before selling additional loans. Once again, Patel retained "K.C." to prepare the audited statements. Once again, Fisher electronically supplied false information to K.C. purportedly confirming FF's assets loans and income.[3] On December 9, 2013, Patel sent Fisher an email containing the new audit, and explained: "The audit is done. It is slightly different than what we gave pennant last year (I can explain differences as to loan timing)."

In April 2014, Pennant requested updated financials, both for 2013 and for the period of January to March 2014 as well as a "good standing" letter from the USDA in order to extend and increase the amount of loans to FF. FF's financial stability was material because FF alone was responsible for collecting and remitting interest

---

[3]   For example, on December 8, Fisher created a document purportedly listing monthly interest payments FF received for loans they fictitiously listed in their financial statement. This list contained loans and borrowers that did not exist, including USDA and SBA lending that did not exist. Fisher sent the list to Patel who copied the document on BMO Bank letterhead and provided it to K.C.

6

payments to investors, and repaying the principal amount of the loans within 24 hours, upon demand. E-mail messages show that Fisher helped Patel create the purportedly independently audited financials, including fabricating the biography of the fictitious auditor.[4] Fisher also obtained a "good standing" letter which although technically correct – i.e. the loans the USDA knew about were in good standing – however, the letter was misleading in that it implied all FF's purported USDA lending was legitimate and in good standing.

Between May 2013 and September 2014, Patel, on behalf of FF, submitted loan packages to Pennant seeking funding for 27 separate fictitious USDA loans. Pennant funded 26 loans before they discovered the fraud. These loans were marketed and sold to Pennant clients who were largely banks and fiduciaries, such as ERISA-covered pension plans, municipalities, and political subdivisions that wanted a no-risk investment and liquidity. The guarantee provided that in the event of a default by FF or the borrowers, the USDA would pay the investors.

Every loan was completely fabricated. In each instance, there was no actual borrower, no USDA guarantee, and no funding of the unguaranteed portion by FF or anyone else. Patel forged the signatures of the purported borrowers and USDA officials, and fabricated multiple documents for each of the loans.

---

4    On April 16, 2014, Pennant asked Patel if he could send a "bio or background on [the auditor]" because they could find no listing for him on Google. The same day Fisher e-mailed Patel a biography for the fictitious auditor, "Geoff King" which Patel, changed to "Geoff Kane" and forwarded to Pennant. Patel directed an employee of a related hotel construction company to create a voicemail for "Geoff Kane" on a drop phone obtained by Patel. The Kane information supplied to Pennant also listed a website that was created by an employee of the hotel business.

*Pennant Loan Proceeds*

The fabricated loans purportedly represented lending by FF in the amount of $211,150,000, of which, the purportedly guaranteed portion of $179,160,000 was sold to investors. Of this amount, approximately $174,791,812.50 was electronically deposited at Patel's direction into the First Farmers Bankcorp account at BMO Harris Bank over which Patel alone had signatory authority.[5]

On June 6, 2013, within a month of receiving the first Pennant proceeds, an LLC jointly owned by Patel and Fisher acquired the Doubletree by Hilton UCF in Orlando. The cash outlay for this purchase was $15.7 million. Fisher obtained a 49% interest in this hotel venture without investing a dollar of his own money.

Patel made further transfers from the First Farmers Bankcorp account at BMO including approximately $27,651,838 into four accounts that Fisher and Patel jointly maintained: ASL Pictures LLC at BMO Bank; First Farmers Financial LLC at PNC Bank; First Farmers Financial LLC, Fund Control Account at PNC Bank; and First Farmers Bancorp LLC, Operating Account at PNC Bank.

Of this $27,651,838, approximately $4,580,338 was transferred into Fisher's personal bank account at Citibank in California. From these funds, Fisher's wife transferred $1,175,000 to Standley Plastics and $100,000 to Profeed Solutions from this account.[6] Fisher used a portion of these funds to purchase an $80,000 Audi,

---

5  The remaining balance was held in a margin account at a financial institution affiliated with Pennant.

6  Fisher arranged to obtain an equity stake in the business in his wife's name. Approximately $1.7 of investor

approximately $150,000 in home remodeling, $1.1 million to fund a loan to Zeolife (diabetes pill company), credit card, travel, and other personal expenses.

Approximately $1,452,890 of investor funds was funneled through the ASL's account at BMO and FF Financial's account at PNC, and spent on multiple movie productions supervised by Fisher.    Additional expenditures of investor funds made on Fisher's behalf included: $33,000 to attend professional basketball fantasy camps, $97,000 in contributions to a charity his wife created in Bolivia, and transferring approximately $87,000 to free an individual in Europe from "a mafia contract."[7] Fisher also used a portion of the investor money to travel.   Between January 29, 2013 and February 12, 2014, Fisher and Patel took approximately seven trips to Panama to "blow off steam."   Investor money also funded multiple trips by Fisher to Europe (five) and elsewhere.

**Losses to Investors**.

*Loss to Illinois Metropolitan Investment Fund*

The Illinois Metropolitan Investment Fund lost approximately $50,422,143 from the fraud.   The converted funds belonged to more than 238 public entities which included over 100 municipalities, 27 police and fire pension funds, 18 public school districts, 15 public libraries, 15 park districts, 3 community colleges and an airport

---

funds were ultimately lent to Profeed, but additional funds were required before that equity stake would vest, and consequently, neither Fisher nor his wife received any of the bargained for equity in the business.

7    His personal expenditures included the payment of legal expenses, real estate taxes, insurance, credit cards, consumer loan payments, hotel and travel related expenses.

authority. These governmental entities lost a significant portion of their funds which they believed to be short-term secure investments. The fraud also had a devastating effect on IMET's business. After discovery of this fraud, IMET's investors pulled their money from IMET in massive amounts. IMET's Convenience Fund (the IMET fund which held the money) decreased from approximately $1.8 billion in September 2014 to less than $500 million in April 2015.

*Harvard Savings Bank*

The fraud caused an $18,084,797 loss to Harvard, which was 100% of the bank's short-term capital. The loss forced the bank to sell its operations and performing stock to another bank and to cancel all of its common stock and terminate the employee stock ownership plan. This fraud directly resulted in the demise of a long standing well-run community bank that had been in existence since 1934.

*UW Credit Union*

The University of Wisconsin Credit Union, the fourth largest credit union in Wisconsin, lost approximately $52,977,011. Despite the staggering size of this loss, the institution remained solvent.

*Winfield Community Bank*

Winfield Community Bank lost $2,070,000, which eliminated its entire capital reserve, and placed it below the capital regulatory requirements. The loss accelerated a planned merger by the bank and worsened the shareholders position by reducing the current and future value of the bank assets. The bank was ultimately

sold for $2 million less than book value, which under normal conditions, was below fair market value.

*US Fiduciary Services*

U.S. Fiduciary Services and its subsidiaries, Pennant Management Inc., GreatBanc Trust Company, and Salem Trust company all suffered financial losses. These losses resulted in an approximately $15 million loss in USFS's market value, and essentially made USFS's Employee Stock Ownership Plan worthless. The fraud also caused substantial litigation and recovery expenses as well as a loss of revenue.

*Pennant Management*

As a direct result of the fraud, Pennant, a registered investment advisor for more than 10, years ceased operations and withdrew its registration as an investment advisor with the Securities and Exchange Commission. Pennant lost all of its 150-200 clients, and 14 of its 15 employees. In addition, Pennant and its related companies became the subjects of civil litigation by their investment advisor clients.

*Salem Trust Company*

The Salem Trust Company operated a Short-Term Investment Fund (STIF) that held $15,817,738 in fraudulent First Farmer loans. The STIF was a collective investment trust in which 41 employee benefit plans were invested, representing 24,928 plan participants, including both retirees and those still working. As a result of this fraud, the funds that remained in the STIF were liquidated and distributed, and the fund ceased to exist.

*US Fiduciary Services LDF Fund*

The US Fiduciary Services Limited Duration Government Fund (LDF) lost $2,614,634 as a result of the fraud. The 217 LDF investors victimized by the fraud were individuals, benefit funds, foundations, trusts, union funds, and nine guardianships established for the benefit of disabled individuals.

*Waterfront Services Company*

Waterfront, an employee-owned river and harbor services company of less than 100 employees in Cairo, Illinois, suffered a loss of $7,211,789, which was approximately 50% of the company's excess capital. This loss impacted the shareholders' retirement accounts on a dollar for dollar basis, and limited the company's long-term growth strategies and acquisition opportunities.

*Encore Bank*

Encore Bank of Naples, Florida, lost $4,825,507 of its short-term capital funds, which was approximately 50% of the bank's short-term capital. This loss affected the bank's overall capital ratio, increased regulatory scrutiny, eliminated the bank's 2014 profits to a fairly substantial loss, and restricted the bank's long-term growth and investment strategy. The loss resulted in the immediate cessation of future investments in all government backed securities and short-term investments, and limited future short-term capital investments to Federal Reserve Notes.

*Citizens Bank*

Citizens Bank of Mukwonago, Wisconsin lost $15,000,000 of its short-term capital as a result of this offense. This loss represented an approximately 18.75% reduction in the bank's short-term capital, resulted in a liquidation of its remaining short-term capital investments in guaranteed investment pools, and change of investment strategy for future short-term capital investments. The bank no longer invests in USDA or SBA products, and limits its guaranteed investments to Federal Reserve Notes.

*Blackhawk Bank*

Blackhawk Bank of Beloit, Wisconsin, lost $5,675,057. This loss represented approximately 10% of the bank's equity and the size of the loss raised regulatory scrutiny. For approximately four months, the bank was required to provide daily liquidity reports to regulators. Although the bank was not in danger of insolvency and continued normal operations, they immediately charged-off $3,000,000, which eliminated the profit for one quarter and affected their overall annual earnings.

*Educational Funds*

Prairie State College Foundation of Chicago Heights lost $44,500 from funds they used to provide need-based scholarships. The losses wiped out an entire semester of scholarships and required the use of savings to fund needed scholarships. Plumbers Local 75 Education Fund of Milwaukee, Wisconsin lost $25,000.

13

## II.    Sentencing Factors

Although the sentencing court must consider the advisory sentencing guideline range in imposing sentence, it is just one factor to be taken into consideration in addition to the factors set forth in 18 U.S.C. §3553.   In considering all of these factors, the government believes a guideline range sentence of 120 months is appropriate.

### A. Nature and circumstances of the offense/characteristics of the defendant

Defendant personally and directly participated in an extensive financial fraud that caused substantial financial harm.   His willingness to fabricate financial documents and misuse loan proceeds provided him with a substantial income, an interest in at least one hotel, the ability to make investments in various speculative ventures, and allow a comfortable lifestyle in which he could indulge his various whims.   Not the least of these indulgences were multiple trips to Europe and Panama, investing in start-up businesses and making horror films.   While Fisher was pursuing other investments and interests, he did little or nothing to ensure the safety of investor funds.

Defendant may seek to portray his crime as a sort-of first offense.   In reality, this is merely the first time he has been caught committing a fraud.   On four prior occasions, Fisher fabricated bank letters in support of fictitious loans.[8]   His prior

---

8    October 2011, Fisher sent Patel a fabricated State Bank of India account statement showing a balance of $22 million to use in support of FF's USDA application.   Fisher and Patel ultimately decided not to use this document,

14

fraud against Legence Bank in Eldorado, Illinois in 2012 escaped notice because Patel secured other funding to payoff the bank loan before the fraud was discovered.[9]

Defendant portrays himself as a gullible dupe, unknowing of the complete extent of the frauds which he helped set in motion, and spending little time or attention to how the funds were being spent. This portrayal is hard to reconcile with his skyrocketing salary and lifestyle perks. If Fisher did not know what Patel was doing with investor funds it was because he consciously did not want to. He desired a grander life than that which his prior honest job provided. He had regular and routine contact with Patel in person as well as by phone, email, and text. Fisher traveled to Florida to meet with Patel on multiple occasions between 2011 and 2013, and met with him on multiple occasions in Panama and elsewhere, including a charter flight from Florida to New Jersey to visit the Saddlebrook Hotel that was purchased with investor funds.

---

because of the difficulty of backstopping any inquiries and settled on using a similar verification on Wells Fargo stationary.

In approximately February 2012, Fisher created a false verification of funds letter on Wells Fargo stationary falsely representing that Medical Investment Holdings held $1,472,214 on deposit, in connection with a loan Fisher and Patel obtained from Legence Bank. Fisher and Patel used a nominee to act as the borrower and thereby conceal their interest in the property. Fisher created a false lease agreement purportedly from Blue Cross to lease the MIH property and provided it to Legence Bank to create the perception of an income stream for the business.

On August 8, 2011, Fisher prepared a fictitious "Letter of Intent" on Wells Fargo stationary for "S.M." in which Fisher falsely represented that the bank intended to lend S.M $3.6 million as part of a SBA loan to build a Wellness Center in Florida.

On August 21, 2012, Fisher prepared a fictitious "Proof of Funds" letter on Wells Fargo stationary for S.M. falsely identifying him as having $88 million on deposit in connection with S.M.'s failed effort to purchase a hotel in New Jersey.

9   The bank suffered no loss because Patel brought in a second investor – Wing Finance to pay off the loan. Wing, was in turn, paid by a fictitious loan to Banes, who was paid by a fictitious loan to Pennant. Fisher has no identifiable role in the subsequent refinancing, but he was aware of the refinancings and benefitted from them.

Although the content of all of their communications cannot be completely known, the available evidence supports the belief that Patel had a larger role in conceiving and directing the fraud on Pennant. It it also clear that at times Patel lied to Fisher about certain sources of funding, such as Patel's father-in-law. However, Fisher was aware that enormous amounts of cash were being obtained using the false financials that he created. Although his direct control over converted funds was arguably limited to the $27 million in the accounts he jointly controlled with Patel, his willing participation in the scheme to obtaining money by misstatements, enabled the larger fraud from which Fisher also benefitted.

### B. Need for the sentence to reflect seriousness of the offense, promote respect law and provide just punishment

Defendant's conduct was extensive and repetitive. Defendant caused the demise of several long-standing businesses and the attendant loss of income and livelihood. There are real victims in this case. This is not a crime involving theoretical losses or just large numbers. The losses are staggering. Now more than ever before, individuals and institutions are forced to rely on their investments and the financial markets. Borrowers such as the fiduciaries who were victims in this case depend on investments in no-risk and government-backed securities. The fraud on Pennant stopped only when a Pennant employee discovered the fraud. There is no reason to believe that this fraud would not have continued absent discovery.

In recent memory, the taxpayers and public have been repeatedly victimized

by large-scale financial frauds. The public and press continuously expressed considerable anger and frustration over the lack of individual accountability for these massive frauds. Defendant's crimes have many victims and caused widespread damage. For that, a substantial sentence is necessary not only to reflect the seriousness of the offense but also to promote respect for the law and provide just punishment.

### C.    To afford adequate deterrence

There is no way for government to legislate or protect itself from people who are committed to being dishonest. There is no way for investors to protect themselves from fabricated financials, inept or complicit auditors, or to investigate every underlying loan in a loan pool. Here, investors relied upon purported layers of guarantees of safety that did not actually exist.

Unlike many other crimes that are committed impulsively or in times of desperation or emotional upheaval; fraud is the product of a weighing process in which the perpetrator weighs the cost and benefits. A fraudster considers the risk of being caught and the likely consequence in the event he is discovered. Fisher, undoubtedly weighed these considerations and concluded that he was unlikely to receive any punishment severe enough to be of consequence. His casual willingness to create false financial statements typifies an individual who had no fear of being caught nor feared any serious consequence.

Fisher engaged in this fraud utilizing large-dollar fabricated financial reports,

17

not long after the large-scale financial frauds associated with Enron and the mortgage industry. The fallout and memory of these frauds had no deterrent effect on the defendant. It is difficult to deter an individual who despite such warnings engages in similar conduct. For individuals such as this, both personal and general deterrence demand a sentence in that will put an end to this type of conduct. A sentence of 10 years' imprisonment is such a sentence.

### D. The Kinds of Sentences Available

The statutory maximum term of imprisonment is 10 year's imprisonment on each count, a fine of up to $250,000 or twice the gross gain or loss resulting from the offenses, whichever is greater, and a term of supervised release of not more than three years. Defendant has agreed to the entry of an order of restitution in the amount of $27,651,838 minus any funds paid prior to sentencing. The Sentencing Guidelines provide for an advisory sentence of imprisonment of 120 months.

### E. To Avoid Unwarranted Sentence Disparities

The Seventh Circuit has previously held that a sentence within the advisory guideline range is the surest way to avoid unwarranted disparities because the Guidelines are designed to ensure like treatment of like situations. *United States v. White*, 737 F.3d 1121, 1144 (7th Cir 2013) *citing United States v. Babul*, 476 F.3d. 498 501-02 (7th Cir. 2007). "[T]he Sentencing Guidelines are themselves an anti-disparity formula" because the Sentencing commission considers the need to avoid unwarranted disparities when setting the Guideline ranges." *United States v.*

18

*Olliver*,–F.3d—2017 WL 4639476 (October 17, 2017) at 8.

## IV.    Conclusion

Defendant's conduct was repetitive and willful. The defendant's dishonesty was not a single lapse of judgment, but rather, involved years of significant deceit. His scheme, born of greed, won him millions and was devastating to the investors who were unwitting victims. The sentence imposed must be sufficient to account for the seriousness of the offense, significant societal harm, and the need to deter the defendant as well as others. The sentence of less than the 10 years is inadequate to address these concerns. Additionally, this Court should order the defendant to pay restitution in the amount of $27,651,838.

Respectfully submitted,

JOHN R. LAUSCH JR.
United States Attorney

By:  *s/Patrick J. King, Jr.*
Patrick J. King, Jr.
Assistant United States Attorney
219 S. Dearborn Street
Chicago, IL 60604
(312) 353-5341

19

# ATTACHMENT A

## Phone SMS - Text Messages - Nik Patel Iphone 5

| # | Number | Name | Date & Time | SMSC | Status | Folder | Storage | Type | Text | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 3251 | 18183951204 | * Fisher Tim | 04/03/2013 14:33:07 (GMT) | | | | Phone | Outgoing | 16m17s phone call | 9:33:00 AM EST |
| 3256 | 18183951204 | * Fisher Tim | 04/03/2013 17:08:55 (GMT) | | Read | Inbox | Phone | Incoming | check your email, if that works, i will prepare for the next two years and update the balance sheet | 12:08 EST |
| 3263 | 18183951204 | * Fisher Tim | 04/03/2013 20:06:11 (GMT) | | Sent | Sent | Phone | Outgoing | Call u in 5 min | 3:06 EST |
| 3266 | 18183951204 | * Fisher Tim | 04/03/2013 22:29:00 (GMT) | | Read | Inbox | Phone | Incoming | brother, email me the tax return for 2012. | 5:29 EST |
| 3264 | 18183951204 | * Fisher Tim | 04/03/2013 22:30:23 (GMT) | | Sent | Sent | Phone | Outgoing | We don't have a 2012 tax return | 5:30 EST |
| 3265 | 18183951204 | * Fisher Tim | 04/03/2013 22:30:28 (GMT) | | Sent | Sent | Phone | Outgoing | I did a p&l but its not relevant to the forecast since p&l shows us selling loans. Forecast should show us keeping loans for interest spread | 5:30 EST |
| 3266 | 18183951204 | * Fisher Tim | 04/03/2013 22:30:33 (GMT) | | Sent | Sent | Phone | Outgoing | Also no need to do projected balance sheet | 5:30 EST |
| 3267 | 18183951204 | * Fisher Tim | 04/03/2013 22:32:20 (GMT) | | Read | Inbox | Phone | Incoming | ok. i am going to forward load the income. what is the exit strategy? | 5:32 EST |
| 3268 | 18183951204 | * Fisher Tim | 04/03/2013 22:32:54 (GMT) | | Read | Inbox | Phone | Incoming | how long are we holding the deals | 5:32 EST |
| 3269 | 18183951204 | * Fisher Tim | 04/03/2013 22:35:17 (GMT) | | Sent | Sent | Phone | Outgoing | No exit | 5:35 EST |
| 3270 | 18183951204 | * Fisher Tim | 04/03/2013 22:35:28 (GMT) | | Sent | Sent | Phone | Outgoing | Just hold 4-5 years then securitize | 5:35 EST |
| 3271 | 18183951204 | * Fisher Tim | 04/03/2013 22:35:50 (GMT) | | Sent | Sent | Phone | Outgoing | Or sell after 4-5 years | 5:35 EST |
| 3272 | 18183951204 | * Fisher Tim | 04/03/2013 22:35:59 (GMT) | | Read | Inbox | Phone | Incoming | ok. i will put it together | 5:35 EST |
| 3273 | 18183951204 | * Fisher Tim | 04/03/2013 22:36:17 (GMT) | | Sent | Sent | Phone | Outgoing | Thanks | 5:36 EST |
| 3274 | 18183951204 | * Fisher Tim | 04/03/2013 22:36:27 (GMT) | | Sent | Sent | Phone | Outgoing | I'd like to send out tomorrow | 5:36 EST |
| 3275 | 18183951204 | * Fisher Tim | 04/03/2013 22:37:37 (GMT) | | Read | Inbox | Phone | Incoming | you will have it tonight month to month projections with loan volume listed on the bottom | 5:37 EST |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3276 | 18183951204 | * Fisher Tim | 04/03/2013 22:38:22 (GMT) | Read | Inbox | Phone | Incoming | any luck on nirmal's deal. thanks. Haven't seen anything yet. Will circle back w/ rusty tomorrow. | 5:38 EST |
| 3277 | 18183951204 | * Fisher Tim | 04/03/2013 22:42:38 (GMT) | Sent | Sent | Phone | Outgoing | Trisha's bday today so been busy with that | 5:42 EST |
| 3278 | 18183951204 | * Fisher Tim | 04/03/2013 22:44:13 (GMT) | Read | Inbox | Phone | Incoming | no worries. have a good celebration. tell trish happy birthday from me | 5:44 EST |
| 3279 | 18183951204 | * Fisher Tim | 04/03/2013 22:46:29 (GMT) | Sent | Sent | Phone | Outgoing | Thanks | 5:46 EST |
| 3280 | 18183951204 | * Fisher Tim | 04/03/2013 22:57:44 (GMT) | Read | Inbox | Phone | Incoming | if we have a line for 50 million, and we are showing 60 million in annual loans, how are we showing so much volume and what are we supposed to do with the | 5:57 EST |
| 3281 | 18183951204 | * Fisher Tim | 04/03/2013 22:57:45 (GMT) | Read | Inbox | Phone | Incoming | differences | 5:57 EST |
| 3282 | 18183951204 | * Fisher Tim | 04/03/2013 22:58:48 (GMT) | Sent | Sent | Phone | Outgoing | They will increase our line. That's the plan | 5:58 EST |
| 3283 | 18183951204 | * Fisher Tim | 04/03/2013 22:59:23 (GMT) | Read | Inbox | Phone | Incoming | cool. I will work out the numbers | 5:59 EST |
| 3286 | 18183951204 | * Fisher Tim | 05/03/2013 00:34:27 (GMT) | Read | Inbox | Phone | Incoming | alright brother, sent the info out. talk to you on the am | 7:34 PM EST (March 4, 2013) |
| 3287 | 18183951204 | * Fisher Tim | 05/03/2013 00:43:38 (GMT) | Sent | Sent | Phone | Outgoing | Thanks | 7:43 PM EST (March 4, 2013) |